IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| TAMARA L. RIVERS, § | |
|     PLAINTIFF, § | |
| § | |
| VS. § | CIVIL ACTION NO. 4:04-CV-539-A |
| § | |
| JO ANNE B. BARNHART, § | |
| COMMISSIONER OF SOCIAL SECURITY, § | |
|     DEFENDANT. § | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER**

This case was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation of the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

A.  STATEMENT OF THE CASE

Plaintiff Tamara L. Rivers brings this action pursuant to Sections 405(g) and 1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the Commissioner of Social Security denying her claim for disability benefits under Title II and supplemental security income or SSI benefits under Title XVI of the Social Security Act. Rivers applied for SSI benefits and disability insurance benefits on June 18, 2002, alleging that her mental impairments have rendered her disabled since October 29, 2001. (Tr. 85-86, 324). Rivers meets the requirements for disability insured status through 2006. (Tr. 83).

After the Social Security Administration denied her applications for benefits initially and on reconsideration, Rivers requested a hearing before an administrative law judge (the "ALJ"), and ALJ Jimmy N. Coffman held a hearing on February 18, 2004 in Fort Worth, Texas. (Tr. 25-45). Rivers was represented by counsel. On March 11, 2004, the ALJ issued an unfavorable decision, finding Rivers was not disabled because she was capable of performing her past relevant work as a receptionist as that job was performed in the national economy. (Tr. 12-18). The Appeals Council denied Rivers' request for review of her case, leaving the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 4).

B.   STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. §§ 404.1520, 416.920. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. §§ 404.1527, 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. An impairment or combination of impairments is severe if it has more than minimal effect on the claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). At the third step, disability will be found if claimant's impairment or

combination of impairments meets or equals an impairment listed in the appendix to the regulations. *Id.* §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* §§ 404.1520(e), 416.920(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(f), 416.920(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198. If the Commissioner meets this burden, the claimant must then prove that he cannot in fact perform the work suggested. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002). A finding at any point in the five-step process that a claimant is disabled or not disabled is conclusive and terminates the analysis. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id*. A finding of no substantial evidence

is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000); *Hollis*, 837 F.2d at 1383.

C.   ISSUES

   1.   Whether the ALJ applied the appropriate legal standards for weighing treating source opinions.

   2.   Whether the ALJ's determination that Rivers could perform her past relevant work is supported by substantial evidence.

D.   ADMINISTRATIVE RECORD

   1.   Treatment History[1]

The medical records in the administrative transcript contain the following information:

Rivers was transported to a local emergency room on June 27, 2000 after taking an overdose of prescription medication. (Tr. 158-59). She advised the attending staff that she had been diagnosed with bipolar disorder and obsessive-compulsive disorder. Rivers was transferred to a behavioral health unit and agreed to participate in a treatment program. (Tr. 141-46).

Rivers subsequently sought treatment with psychiatrist Ronald Pence, M.D., at Pecan Valley Mental Health and Mental Retardation (MHMR) services. (Tr. 196-217, 223-30, 307). During her intake interview in November 2001, Rivers reported symptoms of anxiety and depression. She had

---

[1] Rivers was in a car accident in the early 1990s and sustained injuries to her back and neck.; however, she does not challenge the ALJ's assessment of her physical impairments or exertional capacity. A review of the administrative record will accordingly be limited to the evidence as relevant to her mental impairments.

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 4**

recently lost her job and broken up with her boyfriend, and her teenaged daughter was acting out. (Tr. 225). She also described an abusive childhood. Rivers said she felt "shaky" and would go days without sleeping, then sleep for long periods. She was unable to concentrate and complained of obsessive thoughts about her break up with her boyfriend. (Tr. 225).

Pence diagnosed major depressive disorder or possible bipolar disorder. (Tr. 217). He assessed Rivers' current Global Assessment of Functioning (GAF) score as 40.[2] Pence also evaluated Rivers' medications and prescribed Prozac for Rivers' symptoms, cautioning Rivers to abstain from drugs or alcohol and participate in Alcoholics Anonymous (AA). (Tr. 217).

After two weeks of taking Prozac, Rivers reported continued depression and anxiety symptoms. She admitted drinking alcohol and having some suicidal ideations. (Tr. 211). Her mood was depressed with an appropriate affect, and her thought patterns were coherent, logical and goal directed. Pence prescribed BuSpar to help alleviate Rivers' anxiety symptoms.

On January 11, 2002, Rivers reported some improvement in her obsessive-compulsive behaviors. (Tr. 210). Pence increased the dosage of River's medications. Rivers reported improvement in her condition at a follow-up visit on February 1, 2002, but also reported nightmares and related symptoms compatible with post-traumatic stress disorder. (Tr. 208). Pence again increased the dosage of Rivers' medication.

Rivers returned on March 8, 2002 to report that she had entered a substance abuse

---

[2] A GAF score is a standard measurement of an individual's overall functioning level "with respect only to psychological, social, and occupational functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994)(DSM-IV). A GAF score of 40 reflects some impairment in reality testing or communication (e.g., speech that is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *See id.*

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 5**

rehabilitation program for her alcoholism. She reported feeling less depressed, but was having more anxiety symptoms. (Tr. 207). Rivers was seen the following week with complaints of no improvement in her agitation and fragmented sleep. (Tr. 204). Her medications were increased.

Pence saw Rivers again on May 24, 2002. Rivers had completed her rehabilitation program, but continued to have stressors that included the recent break up of a relationship with a boyfriend. (Tr. 202). Rivers' mood was mildly depressed and somewhat anxious. Pence noted that her thought processes remained coherent, logical and goal directed. Rivers reported that she was seeing another physician who had changed her medications, with a positive effect on her anxiety. (Tr. 202).

Rivers reported a decline in her condition at a follow-up visit with Pence in June 2002. (Tr. 200). She was feeling more depressed and admitted drinking alcohol three times a week. Rivers also complained of flashbacks, nightmares, periods of amnesia, irritability, and poor anger control. Pence discussed the negative effects of alcohol on mood and impulse control and cautioned that he would consider tapering or discontinuing Rivers' medication if she resumed drinking. Pence emphasized that Rivers should increase her involvement in AA. (Tr .201).

Rivers returned on August 9, 2002. She had stopped taking her medication after her last clinic visit because she was worried that she was developing a manic mood. (Tr. 198). Pence assessed a mildly depressed mood and anxious affect, but Rivers' thoughts appeared to be coherent and logical. Pence recommended a different antidepressant, Depakote, and Rivers agreed to the change. (Tr. 198-99). On October 7, 2002, Rivers reported that she had recently been in a motor vehicle accident that had aggravated her neck problems. She thought that the Depakote helped her depression, but she continued to have nightmares and night terrors. (Tr. 196). Rivers was given a

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 6**

trial dosage of Paxil in April 2003 after she reported a decline in her mood. (Tr. 319).

On June 13, 2003, Rivers advised Pence that she had recently had a miscarriage. (Tr. 316). Pence discontinued Depakote and increased Rivers' dosage of Paxil. Rivers' mood remained depressed during a follow-up visit on July 28, 2003. (Tr. 310). In August 2003, Rivers complained of increased stress due to her living situation and reported that her mood was more depressed. She exhibited a moderately depressed mood and constricted affect, but her thought processes were logical and coherent. Pence assessed a current GAF score of 45 and increased Rivers' dosage of Paxil.[3] (Tr. 307-08).

Rivers also sought mental health treatment with psychologist Tiara A. Roberts, Ph.D.. (Tr. 255-89). Rivers saw Roberts on a regular and frequent basis in 2002 and 2003 for counseling for a variety of personal, family and financial problems.

At the request of Rivers' counsel, Roberts completed a written assessment of Rivers' ability to perform work-related activities. (Tr. 291-98). In the assessment dated October 16, 2003, Roberts opined that Rivers had poor or no ability to make occupational adjustments. Roberts also opined that Rivers had poor or no ability to understand, remember and carry out even simple instructions due to her emotional problems. (Tr. 295). Roberts stated that Rivers' ability to behave in a stable manner, relate predictably in social situations, or demonstrate reliability was also poor. (Tr. 297). Roberts noted that Rivers tended to sleep much of the time and was unable to keep her mind on tasks. (Tr. 297). Roberts indicated that Rivers was capable of managing benefits in her own best

---

[3] A GAF score between 41 and 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job). DSM-IV at 34.

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 7**

interest.

    2.    Consulting Examination

Psychiatrist Tara Reddy, M.D., evaluated Rivers on September 16, 2002. (Tr. 192). Rivers reported fluctuations in her mood for the previous seven years. She stated that she had initially been diagnosed with depression and anxiety, but medications for these problems initiated a manic episode. She described feelings of sadness, difficulty sleeping, and recurrent nightmares about being sexually assaulted by her ex-husband. (Tr. 192). Her appetite and weight fluctuated, and she found it difficult to sustain attention. Rivers reported that she was receiving mental health services from MHMR.

Rivers lived with her two teenaged daughters. She typically awoke around four a.m., but her bedtime varied. (Tr. 192). Her children were responsible for the cooking, cleaning, and shopping, but Rivers did the laundry, drove, and handled the mail. Rivers occasionally attended a twelve-step program for recovering alcoholics. (Tr. 192). Rivers also reported being sexually abused by her adoptive father and a military recruiter. She quit high school in the eleventh grade because she was pregnant. Rivers had been married twice and was the mother of four children. (Tr. 193).

Reddy observed that Rivers was casually dressed and appeared older than her age. Rivers was cooperative and made good eye contact during the interview. She was alert and oriented, with no auditory or visual hallucinations. Her mood was dysphoric with an appropriate affect. (Tr. 193). Reddy assessed Rivers' remote memory as good, and both recent and immediate recall were intact. Rivers demonstrated good concentration and her judgment was considered intact. Reddy described Rivers' pace and persistence as slowed. (Tr. 193). Reddy diagnosed bipolar disorder and assessed

**Findings, Conclusions and Recommendation of  
the United States Magistrate Judge–Page 8**

a current GAF score of 65.[4] Rivers' prognosis was considered good with continued treatment. (Tr. 194).

    3.    Administrative Hearing

Rivers was born September 28, 1966. (Tr. 72). She quit school in the eleventh grade and most recently worked as a receptionist in a law office, but she was terminated for absenteeism. (Tr. 28, 92). Rivers testified that she had missed work frequently because of depression and trouble she was having with her teenaged daughter. (Tr. 28-29). She had been terminated from an earlier job for similar problems with absenteeism and impaired concentration. (Tr. 31). Rivers testified that she had trouble focusing at work and she suffered from night terrors and flashbacks attributable to traumatic events in her life. (Tr. 31-32).

Rivers testified that she had a longstanding habit of pulling out her eyelashes. She had abused alcohol in the past, but stopped drinking in 2002. She spent much of the day sleeping or going to appointments with her doctors. (Tr. 36). Rivers cooked occasionally and tried to eat three meals a day because she was pregnant. (Tr. 38). She performed light housekeeping and did some grocery shopping for her family, but did not socialize with others very often. (Tr. 40-42). Rivers testified that she previously attempted suicide by taking an overdose of pills and had sought treatment for additional suicidal thoughts. (Tr. 42-43).

    4.    ALJ Decision

The ALJ found that Rivers had not engaged in substantial gainful activity since her alleged

---

[4] A GAF score of 61-70 indicates some mild symptoms, but the person is generally functioning pretty well and has some meaningful interpersonal relationships. DSM-IV at 34.

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 9**

disability onset date. The ALJ also found that Rivers had a major depressive disorder and degenerative disc disease. Although severe, those impairments did not meet or medically equal any listed impairment. (Tr. 17). The ALJ further found that Rivers retained the residual functional capacity for sedentary work consisting of only non-complex tasks in a routine setting and limited to tasks requiring only incidental public contact. (Tr. 16-17). The ALJ considered Rivers' past relevant work and found that Rivers' residual functional capacity did not preclude her from performing her previous job as a receptionist. (Tr. 17). Accordingly, Rivers was not considered disabled or entitled to disability insurance or SSI benefits.

D.   DISCUSSION

   1.   Treating Source Opinions

Rivers asserts that the ALJ failed to apply the appropriate legal standards for weighing the treating source opinions from psychologist Tiara Roberts. Rivers correctly notes that the questionnaire Roberts completed in October 2003 reflects substantial restrictions in River's mental functional capacity.

The opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's impairments, treatments and responses, should be given great weight in determining disability. *See Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994). The Commissioner assigns controlling weight to the opinion of a treating physician if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.927, 416.927; *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995).

Even if a treating source opinion is not entitled to controlling weight under the regulations, that does not mean the opinion should be completely rejected. In many cases, the opinion may be entitled to the greatest weight and should be adopted even if it does not satisfy the test for controlling weight. Social Security Ruling 96-2p. However, the determination of disability always remains the province of the ALJ, and the ALJ can decrease the weight assigned to a treating physician's opinion for good cause, which includes disregarding statements that are brief and conclusory, unsupported by acceptable diagnostic techniques, or otherwise unsupported by the evidence. *See* 20 C.F.R.. §§ 404.927(e), 416.927(e); *Leggett*, 67 F.3d at 564; *Greenspan*, 38 F.3d at 237. The ALJ must consider the following factors before rejecting a treating source opinion: the length of the treatment relationship, frequency of examination, nature and extent of the treating relationship, evidence supporting the opinions, the consistency of those opinions, and medical specialization. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d); *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000). *See also* SOCIAL SECURITY RULING 96-2p, 96-5p.

Although the ALJ did not specifically state that he was addressing the relevant factors outlined in the regulations,[5] his opinion addresses those factors in a narrative fashion. The ALJ observed that the records from Rivers' sessions with Roberts were counseling notes that contained no objective mental status examination findings, and Rivers' MHMR records reflected grossly normal mental status evaluations. (Tr. 15). The ALJ found that the extreme limitations Roberts would impose were not supported by objective clinical findings from any other treating or

---

[5] The ALJ did acknowledge his duty to consider the medical opinions in accordance with Social Security Ruling 96-2p, which specifically requires the adjudicator to weigh treating source opinions according to the factors set out in Sections 404.1527 and 416.927. *See generally* Social Security Ruling 96-2p.

**Findings, Conclusions and Recommendation of  
the United States Magistrate Judge–Page 11**

examining mental health specialist.  The ALJ also reasoned that Roberts likely intended to support Rivers in obtaining social support services, but Roberts' opinion did not represent an informed opinion about disability as defined for purposes of the Social Security Act. (Tr. 16).

Rivers does not argue that Roberts' opinion was entitled to controlling weight, but instead complains that the ALJ erroneously ignored the opinion once he decided that the opinion did not deserve controlling weight.  Rivers asserts that the ALJ, if he had fulfilled his duty to consider Roberts' opinion in light of the relevant factors for weighing medical source opinions that are outlined in the regulations, would have found that Roberts' opinion deserved substantial weight and special consideration.

Rivers criticizes several aspects of the ALJ's decision.  She asserts that the ALJ was misplaced in his reasoning that Roberts formed her opinion based on subjective commentary in counseling notes rather than objective mental status evaluation findings.  A review of Roberts' records, however, supports the ALJ's statement.  The handwritten notes primarily record Rivers' subjective complaints about her family and general situation, rather than the results of Roberts' objective evaluation.

Rivers also contends that Roberts' opinion is supported by GAF scores of 50 or below that have consistently been assessed by her treating mental health specialists.  A GAF score reflects a clinician's judgment about an individual's overall functioning and is a useful tool in planning treatment, measuring its impact, and predicting outcome. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32  (4th ed. 1994)(DSM-IV).  But there is no authority to suggest that any particular GAF score is a determinative measure of disability for

**Findings, Conclusions and Recommendation of  
the United States Magistrate Judge–Page 12**

purposes of assessing a claimant's disability or residual functional capacity (RFC) for work-related activities. It was not inappropriate for the ALJ to rely on contrary evidence demonstrating that objective mental status testing by Rivers' treating sources had yielded relatively normal results. In addition, consulting examiner Reddy assessed a higher functioning GAF score of 65. Rivers suggests that the score is an anomaly and specious, but has no qualifications for making this challenge, and the relatively minimal findings that Reddy recorded during her evaluation do not suggest that Reddy assessed a GAF score that is without foundation.[6]

The ALJ acknowledged his duty to consider the opinions of treating and examining sources, and provided sufficient reasons for finding Roberts' opinions were not entitled to controlling weight and were not well supported by objective mental status observations.

2.    Past Relevant Work

Rivers asserts that the ALJ failed to develop the record relating to the mental demands of her past relevant work as a receptionist and his determination that she can perform the job of receptionist is unsupported by substantial evidence.

A claimant is not considered disabled when she retains the RFC to perform the actual functional demands and job duties for a particular past job <u>or</u> the functional demands and job duties of that occupation as generally performed in the national economy. SOCIAL SECURITY RULING 82-61. In determining whether a claimant can return to his past relevant work, an ALJ must make

---

[6] Rivers also contends that there is no basis for the ALJ's statement that Roberts offered her opinion with the intent of supporting Rivers in her quest for social services. The interrogatories that Roberts completed make it apparent that the questions are related to Rivers' ability to support herself, and Rivers had discussed her efforts to obtain disability benefits with Roberts. (Tr. 258).

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 13**

findings of fact regarding the claimant's residual functional capacity (RFC) and the physical and mental demands of past relevant work, then the ALJ must directly compare the two. *Latham v. Shalala*, 36 F.3d 482, 484 (5th Cir. 1994).  SOCIAL SECURITY RULING 82-62.  The claimant is the primary source of vocational documentation, and the claimant's statements are generally sufficient to determine skill level, exertional demands, and nonexertional demands of a previous job. SOCIAL SECURITY RULING 82-62.  For situations where available documentation and vocational resource materials are insufficient to determine how a particular job is usually performed, it may be necessary to obtain the services of a vocational expert. SOCIAL SECURITY RULING 82-61.  The ALJ must develop enough information about past work to permit a decision about a claimant's ability to return to that work, and must provide a rationale explaining how a decision was reached.  SOCIAL SECURITY RULING 82-62.

In compliance with Social Security Ruling 82-62, the ALJ considered the requirements of Rivers' previous job as performed in the national economy and compared that with her given residual functional capacity.  The ALJ found that the job of receptionist is classified as semi-skilled work according to the Dictionary of Occupational Titles (DOT) and is predictable, routine work that did not require execution of complex job instructions.  (Tr. 16). He also indicated that contact with the public is only incidental to the client base in the office where the job of receptionist is performed.  The ALJ found that Rivers was capable of performing the foregoing duties in an office setting and was thus able to return to her previous job as a receptionist.  (Tr. 16-17).

Rivers asserts that the ALJ had no basis for his determination that the job of receptionist for a law firm required only incidental contact limited to the client basis in the office where the work

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 14**

is performed. Rivers was not questioned about the mental demands of her previous job, but testified that she generally got along with others–although she did not want to be around other people at times. (Tr. 42). The DOT does not quantify the amount of public contact required, but it provides the following description of a reception's job duties:

> Receives callers at establishment, determines nature of business, and directs callers to destination: Obtains caller's name and arranges for appointment with person called upon. Directs caller to destination and records name, time of call, nature of business, and person called upon. May operate PBX telephone console to receive incoming messages. May type memos, correspondence, reports, and other documents. May work in office of medical practitioner or in other health care facility and be designated Outpatient Receptionist (medical ser.) or Receptionist, Doctor's Office (medical ser.). May issue visitor's pass when required. May make future appointments and answer inquiries [INFORMATION CLERK (clerical) 237.367-022]. May perform variety of clerical duties [ADMINISTRATIVE CLERK (clerical) 219.362-010] and other duties pertinent to type of establishment. May collect and distribute mail and messages.

DICTIONARY OF OCCUPATIONAL TITLES § 237.367-038 (rev. 4th ed. 1991). This description is compatible with the ALJ's determination that a receptionist's public contact is limited to persons with business at the office where the receptionist is located and provides substantial vocational evidence to support the ALJ's determination.

The ALJ's decision at Step Four of the sequential evaluation process has not been shown to be a product of legal error or unsupported by substantial evidence.

RECOMMENDATION

It is recommended that the Commissioner's decision be affirmed.

NOTICE OF RIGHT TO OBJECT TO PROPOSED
FINDINGS, CONCLUSIONS AND RECOMMENDATION
AND CONSEQUENCES OF FAILURE TO OBJECT

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 15**

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document. The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until August 30, 2005. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

## ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until August 30, 2005 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby

is returned to the docket of the United States District Judge.

            SIGNED AUGUST 9, 2005.


            <u> /s/ Charles Bleil      </u>
            CHARLES BLEIL
            UNITED STATES MAGISTRATE JUDGE

**<u>Findings, Conclusions and Recommendation of</u>**
**<u>the United States Magistrate Judge–Page 17</u>**